At a Court of Oyer and Terminer held at this term, Ebenezer W. Frazier was indicted and tried
for the murder of John A. Eliason in the first degree, at Middletown, on the 9th day of December 1864. The deceased, whose wife was a sister of the prisoner, resided with his family and was engaged in the mercantile business in that place at the time. From the evidence it appeared that his domestic relations had not been happy, although no open rupture or separation had occurred between him and his wife in consequence of it, but notwithstanding this had produced unfriendly relations between him and other members of her family, the prisoner had always continued on the most friendly and intimate terms with him, and on all occasions of dissatisfaction or alienation between them, had uniformly sided with the deceased, until the occurrence in question, although his affection for his sister and his frequent and friendly visits to their house had been apparently in no degree diminished or affected by it. The residence of *Page 178 
the prisoner was in Maryland, several miles from Middletown, but he had arrived there in the evening train on the preceding day, and spent the night at their house, and the whole of it up to twelve o'clock, in friendly conversation with the deceased in his sitting room a greater part of the time, and afterwards with him and his sister in her bed room, who was too unwell to leave it, when they respectively retired to their separate rooms for the rest of it. The next morning he arose early and breakfasted at the hotel, but soon afterwards returned to the house of the deceased, and went up stairs to the room of his sister where he found them together with one of their sons, a lad ten or eleven years of age, and invited the deceased to take a ride with him to his mother's over in Maryland, which he declined, as he was not feeling very well, when he invited the son and asked the consent of both the father and mother for him to go with him, which they gave; he then asked the deceased for the loan of his horse and buggy for the purpose, which were obtained, and soon afterwards the prisoner and his nephew started on the drive and were gone until about four o'clock in the afternoon. During their absence they visited and dined at his father's, and he was alone for some time in a room with his mother to which they retired from his nephew and the others at the house. On their return they stopped at the hotel at the Head of Sassafras, where the prisoner took during their halt there three drinks at the bar. He then drove back to Middletown and to the hotel of Mr. Davis where he left the horse and buggy and his nephew to drive them home, and went into the bar-room and took a drink, and soon afterwards left it and walked to the house of the deceased and up to Mrs. Eliason's bed room where she than was, and enquired for John (meaning John A. Eliason) and where he was, but who had just before left it and gone down to the sitting room below it by another stairway as he went up to it. He then descended the stairs and entered the sitting room shutting the door of it behind him, at the same time the son of the deceased *Page 179 
before referred to, left the sitting room by a door opening on an alley and stood under the window of it with his back towards it and looking on the street. Just after he had left the sitting room a colored woman and a servant in the family, entered it with a message from Mrs. Eliason to Mr. Eliason that she wished to see him in her room up stairs, when she found no one in it but Mr. Eliason and Mr. Frazier, and who described their respective positions in it as follows: Mr. Eliason was seated in a chair by the fire-place with his hat on, his legs crossed, and with his hands clasped across his knees and leaning forward with a segar in his mouth, while Mr. Frazier was standing at the end of the mantel-piece with one elbow resting on it and the other arm akimbow, between Mr. Eliason and the door leading into it from the entry and with his back turned towards the door. She delivered the message to Mr. Eliason and left, but had not returned up stairs more than a minute or two when she heard the report of a pistol, and looking out of a window over the alley saw Mr. Eliason running from it and Mr. Frazier after him. She had heard no words and no noise of any kind in the sitting room, either before or after she left it to go up stairs on that occasion, and this was corroborated by the testimony of the son who had been standing in the mean while and only for a few minutes under the window of the sitting room in the alley as before mentioned, when his father suddenly jumped from the door of it into the alley with the cry of murder, and ran down it pursued by his uncle with a drawn pistol in his hand, and which he first fired at him as his father passed him (the witness) in the alley, and before he reached the alley gate and when he was but a few feet behind him, and which he afterwards fired at him three times whilst he was pursuing him in the street.
It was further proved by other witnesses that they were walking down the street towards the railroad depot about half-past four o'clock that afternoon, when their attention was called by the cry of "murder! help! help! gentlemen!" to two men who had just come out of a side door *Page 180 
of the house of the deceased, both running down the alley without their hats, and one of them pursued by the other and not more than eight or ten feet from him. The foremost one had about reached the gate of it when they first heard the report of a pistol, and as the chase passed into and along the street they saw the prisoner, whom they recognized and identified as the person who was pursuing the other fleeing from him, fire a pistol three times afterwards at him just about as fast as a revolver could be successively fired by a man when running. Another witness, Mr. Martin E. Walker, a particular friend of the deceased, had heard the reports of the pistol and had by this time reached the side of the street, when he saw the deceased running slowly and feebly towards him with one arm and hand behind him and the other uplifted and extended before him, and ran to meet him, and just as he reached him, he exclaimed as his legs seemed to give way under him, "catch me Martin!" and fell into his arms. He at once asked him what was the matter with him, and he answered that he was shot. He then asked him who had shot him, and he replied "Eben Frazier;" but the prisoner had then disappeared from the street, and was not in sight of the witness when he reached the side of it. Both the prisoner and the deceased were without their hats when they leaped from the sitting room door and during the chase in the alley and on the street, but the prisoner returned from it to the house of the deceased and was heard to say as he re-entered the alley "now let them come on with their d___d officers and arrest me as soon as they may!" But he soon afterwards reappeared on the street in his hat, and went to the hotel and not only took a drink, but invited others to drink with him without any effort made in town to arrest him; it was now dark, however, and he must have soon afterwards left it, for by half-past nine o'clock that night he was at Bear Station, sixteen miles up the railroad from Middletown, where he got on a freight train and rode to Wilmington, but being suspected by the officers of it who *Page 181 
had heard of the shooting of the deceased while the train was at Middletown, although he was personally unknown to them, he was through their instrumentality arrested for it on the arrival of the train at Wilmington. The prisoner until recently had been the U.S. Deputy Provost Marshal of the district in Maryland in which he resided, and the revolver with which the shooting was done was the same which he had whilst in office and since usually carried about his person.
The deceased was at once carried to a drug store near at hand and a physician sent for who found two small bullet wounds on his body, one entirely through the posterior part of the thigh of his right leg, and the other in his back about two inches above his right hip and about the same distance to the right of the spinal column, in which the bullet had penetrated and lodged in the body and which on probing could not be found. By his direction he was then removed to his own house, and in undressing him, a small four-barrelled pistol fully charged was found in his coat pocket, and which it appeared from the evidence he had been habitually carrying about him in the inside pocket of it for a month or more at that time. He languished in severe agony at times for one week, or until the following Friday when he died, the wounds having been inflicted on the preceding Friday afternoon. During the examination of the witnesses on behalf of the State, the attorney general propounded the enquiry to one of them who had assisted in undressing the deceased after his removal from the drug store to his residence, what statement he then made in his presence in regard to his having been shot, and by whom and how it was done.
T. F. Bayard, for the prisoner, objected to the admissibility of any declaration then made by the deceased in regard to the matter after the length of time which had elapsed since the shooting. *Page 182 
 Moore, Attorney General. The statement or declaration he propsed to prove was made so soon after the deceased was shot by the prisoner, that it could and should be considered as contemporaneous with the main fact under consideration, and was therefore properly admissible in evidence as a part of the res gestæ under the well settled rule of law on that subject. 1 Greenl. Ev. sec.
108.
Bayard, in reply, cited 3 Phil. Ev. Cow. Hill'sNotes, 1 Part 207.
The Court then enquired and learnt from the witness that a period of not less than twenty-five or thirty minutes had elapsed between the time of the shooting and the removal of the deceased from the scene of it, and of his being undressed and laid to bed in his own bed chamber, after which the statement referred to had been made by him, and were of opinion that under the circumstances and after such a length of time having intervened, that it did not properly constitute a part of the res gestæ, and that it was therefore not admissible in evidence.
A witness for the State who sat up with the deceased on the succeeding Saturday night and Tuesday, testified that on one or the other of those occasions when he enquired of him how he (the witness) thought he looked, to which he replied, better, although he did not think so, the deceased then said he was there for his winter quarters, and also said that he did not think he would recover.
Another witness testified that he heard him say as they laid him on his bed after bearing him home from the drug store and undressing him, "Gentlemen, it is all of no use, this is my death bed." And that he afterwards told him to take good care of his keys, that one of them was the key of his safe, and his safe contained papers which would be very important to his children. And again on Sunday he heard him say he could not live. He heard him praying also on Sunday, and several times afterwards, but never *Page 183 
before that time, although he had lived in his family for several years past. He was not a member of any church.
A brother of the deceased also testified that he said to him on Sunday afternoon, that he could not live or recover from his wounds.
Another testified that he heard him say on Monday that he could not recover. And another that he had twice heard him say the same, once on Saturday and again on Sunday. It was then proved that he sent on Sunday afternoon for a friend for the purpose, and had an alteration made in his will; but on cross examination he stated that he said nothing to him about dying, or expressed any apprehension of death whilst he was with him.
As all this was understood to be but the prelude to an offer on the part of the attorney general of certain declarations in evidence afterwards made by the deceased and reduced to writing at the time.
Mr. Bayard said he had a witness whom he would like the Court to hear before it passed upon the important question which was now about to arise in the case, from whose testimony, if he was correctly informed, it would appear that the deceased was not impressed with the apprehension of death, but was still hopeful of living and surviving his wounds when the declarations were made; and asked the Court that he might now be called to the stand and sworn.
The Attorney General objected that it was altogether irregular and contrary to the established practice of the Court in such cases. It was not, however, the first time that such an application had been made in a similar case in the Court of Oyer and Terminer in this State, for identically the same application was made to and refused by *Page 184 
a majority of the Court, one Judge only dissenting, in the case of theState v. Cornish for the murder of Saulsbury, 5 Harr.
502.
The Court, after consideration, refused the application and excluded the witness and his testimony at this stage of the trial on the ground of its irregularity and the long established practice of the Court to the contrary. This would not appear to be as strong a case for the prisoner for such a ruling as we are now asked to make, as was the case of the State v. Cornish cited by the Attorney General, and yet in that case a majority of the Court overruled and refused a similar application. As to the admissibility in evidence of dying declarations, as they are usually termed, in such cases, it is of course the province and the duty of the Court to pass upon and determine the preliminary question whenever it is raised, whether they were made under such an apprehension of impending death from the wound or injury received, as will entitle them in their opinion to be admitted in evidence to the jury according to the rule of law on that subject, and the practice of this Court as it has hitherto always been, and such as we believe has also been the general practice both in the Courts of this country and of England, to determine that preliminary question for or against their admissibility in evidence to the jury, on the prima facie proof presented on that point by the direct and cross-examination of the witnesses produced by the State to stablish it, without hearing any witnesses on the other side to rebut or controvert it; and in view of the great and vital importance of their decisions in such cases to the accused, we believe we can further say that the Court has always felt the full weight of the solemn responsibility devolved upon it in every such instance. But after all, when they are clearly and conclusively entitled to it, and are duly admitted in evidence in the case, they rest on the same level with all the other evidence in it, and the credit, weight and effect of them are alone to be considered and determined by *Page 185 
the jury; and they may after their admission in evidence be weakened and impaired, contradicted and disproved by the witnesses and the testimony for the prisoner subsequently produced on his behalf in the trial.
The Attorney General then offered in evidence two affidavits, the formal proof of which had already been produced in the case, made by the deceased and taken by Jesse Lake, a Justice of the Peace of the county, one of them on Saturday and the other in the afternoon of Monday after he was shot, each of which had been drawn by him in writing at the instance and dictation of the deceased, and read over to and approved and signed by him, and to the truth of which he had afterwards been formally sworn by him on the days before mentioned, and which contained a statement of the facts and circumstances by the deceased under which the prisoner made the attack upon him and shot him, and which he contended were admissible in evidence, not as affidavits, or by virtue of the sanction and solemnity of the oath under which the Justice of the Peace had unnecessarily taken them, but as dying declarations, or a solemn statement made by the deceased in regard to the matter under a solemn and profound apprehension of impending death; and in case of the last and more important one only four days before he died. 1 Greenl. Ev. Sec. 156. State v.Thaughley, 4 Harr. 562. 1 Arch. Cr. Pl. 141n. 1. 1 Arch. Cr. Pl. 452. 1 Greenl. Ev. Sec.
158. 1 East's Pl. Crown 354. 2 Ld. Cr. Cases 238.
Bayard objected and contended that they were not such declarations as the law required in such a case, and were therefore not admissible in evidence to the jury. 3 Phil. Ev. Cow. Hill'sNotes, 1 Part 252.
Moore, Attorney General, in reply, cited 2 Stark. Ev. 262.
The Court. This is often a very nice as well as a very grave question, for the rule of law which governs it is not *Page 186 
unfrequently of difficult application. These papers arc offered in evidence as the dying or death-bed declarations of the deceased in regard to the time, place and manner in which he was attacked and shot by the prisoner at the bar, while he was yet languishing under the fatal wound received at his hand, and only four days before his dissolution in consequence of it. In such a situation and in view of that death which he fully apprehends and believes in his own mind to be surely and inevitably approaching and near at hand, the conscious solemnity of the occasion and his duty to speak the truth, and nothing but the truth, is rightly assumed in law to invest his declarations made under such circumstances with as high a sanction and as much credibility, as if made under the obligation of an oath duly and formally administered in a court of justice under ordinary circumstances; and the rule of law on the subject to which we have alluded we understand to be that whenever such declarations are offered in evidence in a trial like this, that to warrant their admission it must first appear to the satisfaction of the Court that they were made by the deceased under the apprehension of impending death, although it is not essential that he should then apprehend immediate dissolution, for it is sufficient if he at the time apprehended it to be impending. 2 Stark. Ev. 459. This is the rule as stated by Mr. Starkie. And although Mr. Greenleaf whose work on evidence has also been cited, also says that the length of time which elapsed between the declaration and the death of the declarant, furnishes no rule for the admission or the rejection of the evidence, he qualifies it with less precision and certainty by adding that it is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible. Therefore, where it appears that the deceased, at the time of the declaration, had any expectation or hope of recovery, however slight it may have been, and though death actually ensued in an hour afterwards, the declaration is not admissible. On the other hand, a belief that he will *Page 187 
not recover, is not in itself sufficient, unless there be also the prospect of almost immediate dissolution. 1 Greenl. Ev. Sec.
158. In the original work of Phillips on evidence it is thus stated, "but before such declarations can be admitted in evidence against a prisoner, it must be satisfactorily proved that the deceased, at the time of making them, was conscious of his danger, and had given up all hope of recovery. And that the question, whether the deceased made the declarations under the apprehension of death, is a question for the Court to determine, not the jury." 1 Phil. Ev. 200. In this case it appears from the testimony of the several witnesses who have been examined on this point particularly, that on Saturday, Sunday and Monday, during the time embraced in the two affidavits and up to the time when the second one was taken, the deceased had repeatedly declared his belief that he must die, and that he could not recover from the wounds he had received, and that on no occasion during that time, or afterwards so far as we are informed, did he allude to the subject without expressing that conviction in a manner which leaves no room for any doubt or misgiving on our part as to the entire sincerity and solemnity of that conviction on the part of the deceased, or of the fact that they were uttered by him under the hopeless and despairing impression that his death was then imminently impending as the inevitable result of them. It is, therefore, the opinion of the Court that the evidence offered by the Attorney General is admissible.
Both of the affidavits or depositions were then read in evidence, but as the second substantially included all that was contained in the first and was much fuller in its statements, it alone is here given, and was as follows:
 MIDDLETOWN, Dec. 12th, 1864.
John A. Eliason further deposes and says that Eben W. Frazier came to his house Thursday afternoon, the 8th day of December, 1864, and in conversation with him, he the said Eben W. Frazier told him that he had come to *Page 188 
Middletown to kill a man, and during the evening they talked over matters in a friendly manner respecting Mrs. J. A Eliason, and that the said Eben W. Frazier agreed with him on the subject, and said he would stand by him, or back him. When going to bed his suspicions, however, were somewhat aroused and he closed the avenues leading from the room in which Eben W. Frazier slept, and his own room in which he slept. On Friday, 9th of Dec., 1864, the said Eben W. Frazier proposed that he should take a ride with him, and he told him he could not go, but that he could have his horse and carriage, and that he accepted the offer and took with him his son, Frank Eliason, and returned about the middle of the afternoon driving past his house towards the hotel, and that Frank brought the horse and carriage home; after which the said Eben W. Frazier came back to his house and went up stairs to the room occupied by Mrs. Eliason, after which he came down stairs and came into the room where he was sitting on the rocking chair, and that they in a friendly manner talked over the matter which they had talked about the afternoon before, and that he acquiesced in what he said to him. After which he went up to Mrs. Eliason's room again, but soon came down again into the room in which he was sitting and enquired for his cane which was shown him, when he took it up and then took a seat in a chair beside him, and putting his hand on him, said to him that he had told Ella that he would have no fuss with him for he had always found him a reasonable man; but he thought it would be better if she could remain with her little, children, when he replied to him that probably it would be, if he could have an assurance that there would not be a repetition of the past, which had occurred two or three times already, when Frazier looked up at the clock and said it was near car-time, to which he replied "it wanted twenty minutes yet, stay, we will soon have some supper," when he replied he did not want any, then he immediately jumped up and drew his revolver and said, "John! I am going to kill you right *Page 189 
here!" He asked him what for? He said "I don't know." Whereupon he rose up from his seat and remonstrated with him, to which he replied and said that he had come down expressly to kill him; he then asked him if that was still his determination, he said yes, he then made for the door and shut it after him, and ran out into the alley, and then into the street, and that Frazier ran after him and shot him with one ball in the alley, and shot at him two or three times after he had got into the street, hitting him with another ball in the street.
 JOHN A. ELIASON.
Sworn and subscribed to, Dec. 12th, 1864, before
 JESSE LAKE, J. P.
Mrs. Ellen Hanson was then sworn and testified that she was at Mr. Eliason's house that day, between 4 and 5 o'clock in the afternoon, up stairs in Mrs. Eliason's room, who was very sick, and remained from ten to twenty minutes. While there a gentleman came up stairs into her room, and soon went down again, who she told her was her brother after he went out, and whom she now recognized as the prisoner at the bar. He soon came up again into her room, and said to her it was near car-time, and he must leave. He then bade her good-bye, and she asked when he would come again, and he said in two or three days, and then went out and down stairs again. She left in about five minutes afterwards, and had not got across the street before she heard the report of a pistol and others soon afterwards, but did not see where they came from. The State then proved by a servant in the family that she was in the sitting room in an hour and a half or two hours after the deceased was shot, and there was then no derangement in the furniture of it, or other indication of any scuffle or personal collision having occurred in it between the prisoner and the deceased.
The coroner of the county testified that he held an inquest on the dead body of the deceased the day after his *Page 190 
death, and produced the two pistol bullets which were proved before him in the inquest to be the bullets with which he had been shot. He also had a post mortem examination made of it by Dr. Chamberlain and Dr. Barr, who had been in professional attendance on him from the day he was shot until his death; and who were next called to the stand and testified that the bullet wound in the right thigh was neither mortal or serious in its character, but that the bullet which struck him in the back about two inches to the right of the spinal column and about two inches above the right hip, had penetrated the body to the depth of six or eight inches, and passing through the grand colon or intestine, had lodged in the cavity of the abdomen in about an inch and a half of the navel on the right side where it was found. Inflammation of the colon and the other part penetrated by it ensued in a few days and that was the cause of the death. That wound was a mortal one and caused his death. He had not been well the day he was shot, and was very much exhausted by his wounds from the first.
The Attorney General here rested the case and the counsel for the prisoner after his opening to the Court and Jury and reading the statutory definitions of murder of the first and second degrees, and also the provision that a person indicted for murder of the first, may be convicted of murder of the second degree, or of manslaughter, and stating that he would be able to prove that the act was committed without previous malice or premeditation, that the parties were brothers-in-law, and had always been on the best and most friendly terms up to that unfortunate moment, that the prisoner had been drinking very hard that day, and was intoxicated and was so much so as not to know what he was doing at the time; and in addition to that he hoped to be able to satisfy the jury that such a sudden and fatal assault could not have been committed by one such warm friend and brother-in-law upon another, without some altercation and personal collision and *Page 191 
conflict of violence having suddenly occurred and preceded it between them, he proceeded to call and examine several witnesses.
A son of the deceased, seventeen years of age, testified that his father and his uncle, the prisoner, had always been good friends, and he believed that he had always agreed with his father in all matters of difference or dissension which had arisen in the family, and that they belonged to the same political party, and were both Union men.
A colored woman testified that she had lived all her life a servant in the family of the deceased, that the prisoner had been a frequent visitor in it, and he and Mr. Eliason had always been very friendly with each other. That the prisoner came to the house about seven o'clock the evening before Mr. Eliason was shot, and when she went to bed between 9 and 10 o'clock, they were sitting in the dining room together talking; the next morning Mr. Eliason came down stairs first, and afterwards Mr. Eben Frazier came down when Mr. Eliason invited him into the dining room to take a drink, and they went into the room together, that was when he was about starting off in the carriage with Mr. Eliason's son Frank, and that they seemed then very friendly. She thought Mr. Frazier was intoxicated when he came back to the house that afternoon; he staggered, and Mr. Eliason looked as if he had been drinking, he looked so about his eyes; he had been drinking some the day he was shot. She did not see either of them drink that morning when Mr. Eliason invited Mr. Frazier into the dining room to take a drink, because she did not go or see in the room, but she saw Mr. Eliason drink once that morning when she took the pitcher of water to him; she did not, however, see him drink any more that day.
Edwin S. Morris testified that he lived in Maryland, and that between 2 and 3 o'clock in the afternoon of the *Page 192 
9th of December last, he met with the prisoner whom he had long been acquainted with, at the Head of Sassafras, and took two drinks in company with him at the hotel there, and that he was intoxicated at that time. That he and his brother then drove on to Middletown that afternoon, the prisoner driving on behind them up to Davis' hotel there, where he got out of his carriage and took another drink. His brother was going up that afternoon in the cars, and the prisoner told his brother that he was also going up in them, and just as he was about driving off be heard him tell his brother on the hotel porch there that he was going up to bid John A. Eliason good-bye and would meet him at the depot.
Dr. Wm. H. Barr testified that he was well acquainted with both the prisoner and the deceased. That they had always been good friends, and that Mr. Eliason had told him that Mr. Frazier had always sided with him in his family difficulties.
Mrs. Ellenora M. Eliason testified that her brother, Ebenezer W. Frazier, came to their house in the afternoon of the 8th of December last, on the arrival of the train, but her husband not being in at that time he went away and came back after tea and after Mr. Eliason had come home. She was then sick in her room up stairs above the sitting room, and he and her husband remained in the sitting room until about 12 o'clock, when they came up to her room together, and remained in it with her for about a half hour, and then they each retired to their rooms for the night, but before they left he invited her husband to take a ride with him, the next morning, which he declined on account of her sickness. They were in her room together again the next morning before breakfast, when her husband invited him to remain for breakfast, but he did not, and her husband said to him while they were then in her room that if he would stop drinking, he would be one to set him up in business. They were quite intimate. *Page 193 
After he came back in the afternoon from the Head of Sassafras he came to her room for a few moments and left, but came back again in about a half hour to bid her goodbye, saying he would write to her. He was intoxicated, so much so then that he staggered and fell on her bed, and repeated the same words over several times. He then went down stairs and after a while she heard a rattling in the sitting room below, but what occasioned it she could not tell. After she found that he was so much intoxicated, and after he had gone down stairs the second time, she sent a servant down stairs for her husband, fearing not for him, but for the prisoner's wife who was then staying with them, and who she did not wish to see him in such a condition, as she knew how much it would distress and mortify her.
Walter L. Fountain testified that he had known the prisoner ten or twelve years, and was with him at the hotel in Warwick where he halted on his way down to his father's pretty early in the morning of the 9th of December last, and drank twice with him at the bar while there, and observed that he was under the influence of liquor as soon as he saw him, and that he was then about half and half. He did not stagger; but it was not from his gait, but his conversation that he could judge when he was under the effects of liquor.
Lawrence R. Davis was then called to the stand and testified that he sat up with Mr. Eliason from time to time after he was shot, and he told him on Thursday morning, he was then on his easy chair, and they all thought he was in a very bad way. They put him on his bed, and in a little while back again on his chair, when he had a good evacuation of his bowels, after which he said to him "how good that feels, I begin to feel like myself again." That night his brother, William C. Eliason, was there and asked him if he would say that Eben W. Frazier shot him, but he did not answer the question until he asked it the third time. He then answered it, and said "he did, I always said he did." His brother *Page 194 
then said "gentlemen take note of that." He then left the room, and John A. Eliason then said to him, "Larry, why did my brother ask me that question? He must think I am going to die, I hope not." That was all he heard him say. He never expressed any fears of death in his presence.
The uniform tenor of the testimony on the part of the State was that the prisoner had been drinking, but was not drunk that day.
This protracted and tedious case, with its arduous labors, has devolved upon you and upon the Court the most important and responsible duty that ever engages the attention of *Page 195 
the Court and jury. It is of the most vital importance to the prisoner at the bar, because his life is involved in the issue. And it is of very grave importance to the community, because the maintenance of the criminal law is essential to the security and protection of the lives of our citizens, and for the preservation of the peace and good order of society. You cannot, therefore, fail to perceive that this case which is about to be submitted to you for its final consideration and determination, is of the gravest character in every respect, and therefore requires your most serious attention and deliberative consideration. In your deliberations you should not allow any rumors, prejudice or outside influence to operate upon your minds in making up your verdict, but you should confine your investigation entirely to the evidence and the facts as proved in the case. The law you will have from the Court and the facts have been given you by the witnesses from the stand, and it is your duty to apply the law, as I shall expound it, to the facts and make up your verdict accordingly.
With these preliminary remarks, I shall proceed to state to you as plainly and briefly as I am able, the law applicable to the case.
The prisoner at the bar, Ebenezer W. Frazier, has been indicted and is now on trial for murder of the first degree, which is one of the highest grades of crime known to our law. He is charged with the commission of this crime by shooting John A. Eliason, at Middletown in this county, on the ninth day of December last, with a pistol, thereby inflicting a mortal wound in the back of the deceased near the spinal column, of which wound it is alleged he died on the sixteenth day of the same month.
To this indictment the prisoner has pleaded that he is not guilty, and the simple, but important issue which you have been sworn to try is whether he is or is not guilty.
Murder is the killing a human being with malice aforethought, either express or implied by law; the malice in all cases of homicide constitutes an essential ingredient *Page 196 
of the crime, and in the absence of both express and implied malice the homicide falls below the crime of murder of either degree, and amounts to a crime of lower grade (if any).
At common law there is but one degree of murder, but our statute divides the crime into two degrees, denominated the first and second. This statutory division of the crime varies it slightly from its character at common law; the difference, however, is chiefly in the punishment which the law inflicts upon offenders. To convict the prisoner of murder of the first degree, it is necessary that it be shown to the satisfaction of the jury that the homicide was committed with express malice aforethought, and if the jury should not be satisfied that this species of malice existed in the heart and mind of the prisoner when the fatal shot was fired, he will not be guilty of murder of the first degree, express malice being an essential and necessary ingredient to constitute that crime. But although the evidence may not be sufficient in the opinion of the jury to raise the crime to its highest grade, it may satisfy you of the guilt of the prisoner of the lower grade of the offense, that is, murder of the second degree, which may be committed without the existence of express malice, when the facts and circumstances surrounding the case are such that the law will imply malice.
You will remember, gentlemen, that there are two kinds of malice aforethought, that is, express malice and malice implied by law, and it may be necessary in your deliberations to observe this distinction for the reasons which I have already adverted to, and here it becomes necessary that I should explain to you the nature and character of express malice and malice implied by law.
Express malice is, when one person kills another with a sedate, deliberate mind and formed design, being evidenced by external circumstances, discovering the inward intention, as by lying in wait, antecedent menances, former grudges, and concerted schemes to do the party slain some bodily harm. *Page 197 
Malice is implied by law from any deliberate and cruel act committed by one person against another, however sudden, as where one person kills another suddenly without any or without a considerable provocation. The reason why the law implies malice from such wanton, deliberate and unprovoked acts of cruelty is, that they cannot be reconciled upon any principle of humanity.
Having explained to you what in law is termed express malice and what is denominated implied malice, I will endeavor to assist you in applying the facts to the law, without, however, expressing any opinion in reference to the evidence, as it is not the province or desire of the Court to do so, but it belongs exclusively to you to pass upon the evidence and to give to it such weight and effect as in your best judgment it is entitled to. I shall only, therefore, allude to the facts in such wise as may be necessary for illustration.
The prisoner's counsel admits that John A. Eliason came to his death from the effect of a ball shot out of a pistol held in the hand of Ebenezer W. Frazier, the prisoner at the bar, and you are relieved, therefore, from the consideration and determination of the fact of killing, and if the case rested here but little further investigation or consideration would be necessary, for it is a general and well settled principle of law, that every homicide is presumed to be malicious and amounts to murder, until the contrary appears from circumstances of alleviation, excuse or justification, and it is incumbent on the accused to make out and establish to the satisfaction of the jury such circumstances of alleviation, excuse or justification, when they are relied upon as matters of defense.
But whilst the counsel for the prisoner admits that the deceased, John A. Eliason, came to his death by the hand of the prisoner at the bar, and in the manner described by the indictment, he insists that the act was done under great provocation and without malice either express or implied by law, and under such circumstances of alleviation as in law will reduce the crime from the higher grades, *Page 198 
that is, from murder of either degree, to that of manslaughter. When such defense is set up and relied upon by the prisoner, it is incumbent on him to establish to the satisfaction of the jury the facts and circumstances relied upon for that purpose, otherwise the offense will be murder.
The circumstances relied upon by the prisoner as matters of defense, to reduce the alleged crime of murder to manslaughter, are that, on the evening before and on the day of the occurrence, the prisoner and deceased had been drinking together, that the prisoner was at the time of the fatal tragedy in a state of intoxication, and that a difficulty arose between him and the deceased in the sitting room of Eliason's house immediately before the fatal shot was fired, and that the prisoner's reason was so far dethroned and swept away by passion and anger, as to make the consequences of his acts less criminal, and to reduce the crime from murder of either degree to that of manslaughter. Whether the prisoner has established this defense is a matter exclusively for your consideration. But it is to be observed that no provocation, however great, will reduce the crime of murder to that of manslaughter, if there be sufficient time for passion to subside and reason to interpose, and afterwards the slayer commits the homicide with a deliberate mind and fixed purpose, because the killing in such case would be with express malice, and the crime, murder of the first degree.
The premeditation, or intent to kill need not have existed for any particular length of time, for if the jury believed from the evidence, that there was a design or fixed purpose and determination to kill distinctly formed in the mind of the prisoner at the bar at any time before, or even at the moment when he fired the pistol, it was a deliberate and premeditated killing with express malice, and therefore murder of the first degree. If however the shooting of the deceased by the prisoner was not with a sedate and deliberate mind and formed design, so as to amount to express malice and murder of the first degree, *Page 199 
but if you have any evidence or facts proved on either side to satisfy you that it was suddenly done by the prisoner in the heat of blood or gust of passion, without any or without a considerable provocation, it would constitute what is in law denominated implied malice, and in such case it would amount to murder of the second degree. And if it has been shown to you that there was a personal conflict or combat between the parties in the room spoken of immediately before the deceased left it, and on his leaving it the prisoner pursued him and shot him, the offense would be murder of the second degree, unless the provocation was great and the parties were on equal terms of defense; and if the killing was done suddenly on provocation, but after sufficient time had elapsed for the blood to cool and for passion to subside and reason to interpose, it would be murder of the second degree. But if sufficient cooling time had not intervened, and the act was committed, that is, the deceased was shot by the prisoner in a fight upon provocation and in the heat of blood, and in a transport of passion, the offense would be only manslaughter, the indulgence of the law ascribing such acts to the infirmities of human nature, and on the supposition that by the sudden and violent exasperation of the affray a temporary suspension of reason was produced, and the transport of passion excludes the presumption of malice.
There are no precise limits of time within which the blood may be supposed to cool, passion to subside, and reason to interpose, but every case depends upon its own circumstances, and the cooling time would be what was reasonable under the circumstances of the case.
I have endeavored to describe to you the crime of murder of the first and second degrees, and also that of manslaughter, and what constitutes the three several grades of crime, with such illustrations as will perhaps enable you to apply the evidence and determine which one of the crimes enumerated (if either) the prisoner is guilty of. It is competent for you to convict him under this indictment of murder of the first degree, or you may acquit him *Page 200 
as he stands indicted and convict him of murder of the second degree, or of manslaughter, as you may think the evidence requires. The order of your investigation, gentlemen, should be to satisfy yourselves from the evidence, whether the prisoner at the bar, shot and killed John A. Eliason with express malice aforethought, that is, with a sedate, deliberate mind and formed design, such design being generally evidenced by some external circumstances indicating the inward intention; these circumstances may be such as lying in wait, antecedent menaces, former grudges and concerted schemes to do the party slain some bodily harm; there is no other way to discover the secret intentions of the heart. You cannot look into its recesses to ascertain what is there. Necessity therefore requires a resort to circumstances for the indication of the intentions which he concealed in the heart and mind. If upon a full and careful review and consideration of the evidence, and all the surrounding circumstances of the case, you should be satisfied that the killing was done with express malice aforethought, the crime is murder in the first degree; but if you should not be satisfied that express malice existed in the mind and heart of the prisoner at the time he committed the fatal act, you cannot convict him of murder of the first degree, and you will then turn your attention to the lower grade of murder, that is murder of the second degree, which under our statute is when the crime is committed otherwise than is described in the first section of the Act of Assembly defining the crime of murder. The crime of murder of the second degree may be committed without the existence of express malice, as when one person kills another suddenly without any, or without a considerable provocation, the law implies malice, and in the absence of circumstances of alleviation, extenuation, excuse or justification, which must be shown to the satisfaction of the jury by the prisoner, or be developed by the evidence on the part of the prosecution, the crime is murder of the second degree. *Page 201 
It is proper, gentlemen, that I should say something to you in reference to the affidavits of the deceased which have been read in evidence as his dying declarations; such declarations are generally made without the sanction and obligation of an oath, and without an opportunity to those against whom they are used to cross examine the party making them; yet as a matter of necessity and in furtherance of public justice, they are admissible when they are brought within the principles of law, which govern that class of evidence. Crimes of the highest grade are often committed when no eye witness is present; hence the necessity of resorting to this species of evidence, but it should always be received with proper and due caution. Dying declarations of a deceased party are only admissible when made under a sense of impending dissolution, and some writers on the subject go so far as to say, that such declarations to be admissible must be made under a sense of impending and almost immediate dissolution; others have somewhat relaxed the rule, and are not quite so rigid in their construction of it. We think the proper and most sensible construction is, that there must exist in the mind of the party making such declarations at the time they are made, a firm conviction of impending dissolution, if not immediate, at no distant day, and that there should not be a lingering hope of ever recovering.
Whether in this case the declarations contained in the affidavits of the deceased, which have been read to you, were brought within this rule was a question for the Court, as like questions are in all other cases, and upon hearing the evidence on the part of the prosecution we permitted them to go in evidence. From the evidence we first had and on which we permitted the affidavits of the deceased to be read, it did not appear that the deceased, John A. Eliason, said much about his condition, as to fears of death or of hopes of recovery; it did appear however that after he had been taken to his room and was being undressed, he said it was all of no use, he feared he had *Page 202 
fixed him. He also said some time after dinner, that the keys of his safe should be taken care of, that its contents were or might be valuable to his children. And subsequently on one or two occasions, he said he should not live. But after hearing other evidence in reference to this matter on the part of the prisoner, we now deem it cur duty to say to you that the force and weight of these declarations contained in the affidavits are very much weakened and impaired. Mr. Lawrence R. Davis, a witness examined on the part of the prisoner, after the affidavits had been read in evidence, stated that on Thursday night previous to the death of Eliason on Friday, he sat up with him, that one of his brothers asked him that night two or three times if Eben W. Frazier shot him, to which Eliason replied he did, that after the brother of the deceased had left the room, Eliason asked why his brother asked him that question, remarking that he must think I am going to die, saying "I hope not." The remark tends to some extent to show that Eliason was not entirely without hope of recovery, and therefore we say that the weight of the declarations contained in these affidavits is considerably weakened. Yet we are not disposed to take this portion of the evidence entirety from you, but leave it with you to be weighed and considered by you with caution, and accredited so far as you may in your judgment believe it to be entitled under all the surrounding circumstances.
It is proper that I should further say to you in reference to these affidavits, containing statements offered as the dying declarations of Eliason, that they are before you as though they were not sworn to, and that the fact of their having been sworn to by him does not give them an additional force or weight whatever, the oath administered to him by the Justice of the Peace being extra-judicial and unauthorized by law.
You will now take the case, gentlemen, and retire to your chamber and there give it that careful investigation *Page 203 
and consideration which its importance demands, and render such verdict as will have the approval of your own consciences under the responsible duties and solemn obligation resting upon you for the faithful discharge of which you will be answerable to God at the great day.
The jury retired to their room at 8 o'clock in the evening and returned into Court at 6 o'clock the next morning with a verdict of "guilty of murder of the second degree." *Page 204